## JOHN KING v. THE STATE.

No. 227.   Decided December 1, 1909.

**1.—Murder—Change of Venue—Statement of Facts.**

Upon appeal from a conviction of murder, where it appeared from the record that the testimony taken in support of an application for change of venue was not filed and approved during the term of the court, the same could not be considered.

**2.—Same—Practice on Appeal.**

Where, upon appeal from a conviction of murder, it appeared that the statement of facts consisted simply of a reproduction of the stenographer's notes, in the shape of questions and answers, the same cannot be considered.   Following Hargrave v. State, 53 Texas Crim. Rep., 147, and other cases.

**3.—Same—Charge of Court—Reasonable Doubt—Burden of Proof.**

Where, upon trial for murder, the court instructed the jury that, in all criminal cases, the burden of proof is on the State; that the defendant is presumed to be innocent until his guilt is established by legal evidence beyond a reasonable doubt, and in case the jury had a reasonable doubt as to defendant's guilt they will acquit him, and say by their verdict, "not guilty," the same was suffi-

cient, and there was no error in refusing requested charges elucidating the meaning of the statute.

**4.—Same—Charge of Court—Accomplice, Definition of.**

Where, upon trial for murder, the evidence raised the issue of an accomplice, and the court charged the jury that they could not convict the defendant upon the testimony alone of a certain State's witness (naming him) unless they first believed that his testimony was true, and connected the defendant with the offense charged, and that then they could not convict upon said testimony unless they further believed that there was other testimony in the case corroborative of the testimony of said witness, and connected the defendant with the offense charged, and that the corroboration was not sufficient if it merely showed the commission of the offense charged, such charge was equivalent to instructing the jury that the witness was an accomplice, and it was not necessary to define that term.

**5.—Same—Charge of Court—Means Used.**

Where, upon trial for murder, the court's charge, taken as a whole, applied the law to the facts of the case and to the allegations in the indictment with reference to the means used by the defendant in effecting the death of the deceased, there was no reversible error.

**6.—Same—Charge of Court—Murder in the Second Degree.**

Where, upon trial for murder, the evidence did not raise the issue of murder in the second degree, there was no error in the court's failure to charge thereon.

**7.—Same—Evidence—Moral Turpitude of Witness—Judgment.**

Upon trial for murder there was no error in the court's action in sustaining an objection to an attempt on the part of the defense to disqualify a State's witness, on the ground that he had been convicted of a felony, without offering in evidence such judgment of conviction.

**8.—Same—Sufficiency of the Evidence.**

See opinion for facts held sufficient to support a conviction for murder in the first degree, assessing the punishment at imprisonment in the penitentiary for life.

Appeal from the District Court of Tom Green. Tried below before the Hon. J. W. Timmins.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*Taylor & Frink* and *S. E. Taylor,* for appellant.—On question of court's charge on burden of proof and reasonable doubt: Bowen v. State, 3 Texas Crim. App., 617; Black v. State, 1 Texas Crim. App., 368; Chapman v. State, 1 Texas Crim. App., 728; Ake v. State, 6 Texas Crim. App., 398; Shafer v. State, 7 Texas Crim. App., 239; Slade v. State, 29 Texas Crim. App., 381; Horn v. State, 30 Texas Crim. App., 541. On question of accomplice: Collins v. State, 24 Texas Crim. App., 141; Still v. State, 50 S. W. Rep., 355. On question of the court's charge on the means used in effecting death of deceased: Hobbs v. State, 7 Texas Crim. App., 117; Lott v. State, 17 Texas Crim. App., 598; Levine v. State, 22 Texas Crim. App., 683; Serio v. State, 22 Texas Crim. App., 633; Coleman v. State, 26 Texas Crim. App., 252. On question of the court's failure

to charge on murder in the second degree: Hamby v. State, 36 Texas, 523; Shelton v. State, 34 Texas, 662; Benevides v. State, 14 Texas Crim. App., 378. On question of insufficiency of the evidence: Williamson v. State, 37 Texas Crim. Rep., 437; Smith v. State, 44 Texas Crim. Rep., 53; Zollicoffer v. State, 16 Texas Crim. App., 312; Brown v. State, 43 Texas, 478; Mullins v. State, 37 Texas, 337; Landin v. State, 10 Texas Crim. App., 63.

*F. J. McCord,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—The record in this case is a pathetic but striking demonstration of that truism of the Holy Writ, that "The wages of sin is death." The deceased was a woman of the underworld, a habitue of the river district in San Angelo. Her associates, judged from the record, were of the lowest type. The appellant was a young man about town who, to judge from the same record, "ne'er in virtue's ways did take delight." The deceased, Katie Ryan, was found in the river near San Angelo, on Sunday, January 26, of last year. An autopsy disclosed the fact that she did not come to her death by drowning. The safe and certain test of an examination of the lungs disclosed that they were normal and rendered it certain that she was dead when thrown into the water. There were a number of wounds on her person, but the only one that would, in the opinion of the physicians, have caused her death was an injury in the region of the stomach which was a bruise, as Dr. Batts states the fact, covering about two inches of the stomach and six inches of the small intestine, leading off from the stomach; that this bruise was the whole of the thickness of the stomach wall and the intestine was bruised to that extent; that altogether about eight inches were bruised. He also gives it as his opinion that the wound was sufficient to produce death. The last seen of the deceased by her associates was about 8 o'clock on Friday night, January 24, 1908, when she was observed by Guadalupe Garcia, who kept a restaurant in San Angelo. The witness John Huff saw and describes a murder in substantially this language: "The first time I met him was on the corner of the Arc Light Saloon Gallery, on the street. It was about 9 o'clock. Might have been a little after. I don't know exactly how long I was with him. All together about two hours. From the Arc Light Saloon we went down the street west. John King went with me. We had started to the whorehouse. I met him on the gallery. He said: 'Less go to the whorehouse,' and made a cigarette. I told him: 'All right,' and we got up there and was talking a little about him having some trouble in the court, first one thing and another, didn't amount to much, and we got up there to some place we seen a man and woman standing on the street, and he said: 'Less go here.' And we went there. He wanted to talk to the woman and she didn't

want to talk to him and he had trouble with a Mexican. I thought it was a Mexican. At the time he tried to borrow some money from the woman and she wouldn't let him have it, and he caught hold of her and cursed her a little bit and jerked her around and started on down under the hill with her, and got down there, she was hollowing 'Hoolia.' And after he got about half way she got down. And got up then and went on down to the river, and he got the money and I didn't see him any more then for a little while. I didn't see her any more after they went under the hill. And directly he came back and we come on up the way we went down the lane. He said, 'less go,' as soon as he come back to where I was. I didn't go down under the hill, and we come on up the hill and got to Main Street and turned west and then north and went to town. At the time the hollowing occurred down at the river guess I was two or three steps from them. Maybe a little more. The first time at the river. I don't think there was any hollowing right at the river. When the hollowing ceased at the river I was twelve or fifteen feet from him. It was very dark. I could see the bulk of them. I couldn't tell exactly what did occur. There was a little rustling around, scrambling, little noise under the bank, I thought was somebody clearing up the throat, and I heard the water make a noise, rattle in the water, and he came back up the hill and said: 'Less go.' I heard the splash in the water. And there wasn't anything more said then till we got on down to the Bank Saloon. He said: 'Less cross the street.' We went across and went by the Parlor Saloon, and I stopped there a little bit and we went on to Eddie Mayer's saloon and came back there and he said he would go in and get a bottle of whisky. He came back in a little bit. We taken a drink, and came back to the Parlor Saloon. I went in there. I don't know where he went to. I was in there half an hour or maybe an hour. I don't know exactly the time, but was good little bit, and I got my grip and started up here to the depot to a rooming place." Further describing the matter he says: "She tried to get aloose and couldn't. And tried to hollow and she couldn't do that. I tried to get him to turn her aloose and let go. I didn't want to get in any trouble, and he wouldn't do it. She throwed up her hands and I started to help her and he threw up his hand. I thought it best to not monkey with them. After we got up the street here, when I came out of the Parlor Saloon here on the south side, he was waiting there, and went up the street with me. We walked up the street, I guess half way to this rooming place, don't recollect exactly where the place was. We stopped. Anyway, there was some fruit trees there. Some fellow had some fruit trees set out there, and he said: 'If you ever tell this I will kill you. Will blow the top of your head off.' And I told him I wouldn't. He came on back across the south side then this way, and I went on to the rooming-house and went to

bed. That was, I guess, close to 11 o'clock at night. It was some time after 9 o'clock at night when we went to the river. Between 9 and 10 o'clock. I heard some money there; I didn't see any. John didn't tell me whether he got any money there. I asked him for some money to pay for my bed. He wouldn't let me have it. As we went down he said he didn't have any money. He said he owed some fines and had to pay them. It was about twelve or fifteen feet from where I was to where John and the woman were when they were scuffling there on the river. Maybe not so far. I don't know how close John and the woman were from the river. Right close to the water though. I could see the water from where I was. I guess four or five feet, maybe more. I heard a splash in the water. Just sounded like something fell in. I thought it was him that fell in at the time." Corroboration of his testimony is found in the evidence of the witness Pete Freeze, who testified substantially as follows: "My name is Pete Freeze. On the 24th of January, last year, I lived at the same place I do now, in San Angelo. I remember the night Katie Ryan was killed. I lived about sixty yards from where Hoolia lived at that time. I heard some hollowing that night. She was calling for Cander Larias. I looked out to see what it was. I just saw the outline of three people. I don't know whether they were men or women. The person hollowing was one of these three persons. It was the dead women that hollowed. I mean the woman that was afterwards dead. I didn't know Katie Ryan. When I looked out there she just hollowed twice, and he didn't let her hollow any more. I heard the scream of a woman and looked out and saw the outline of three people there. I don't know what these three people were doing. She complained or groaned. I noticed which way they went. They went toward Nannie's house. Nannie is a crippled white woman. They were going in the direction of the road there. I lived about sixty yards east of Hoolia's house. I don't know the direction. They were going on the road in the direction of Hoolia's house." On cross-examination some of the matters stated by him are rendered somewhat more clear, and this cross-examination is here given: "This was a dark night. I was about twenty-two yards from these parties I claim to have seen the outline of. I never did measure it. It is right close there. It was nearer from where I was to where these parties were than it was from Hoolia's house to where they were. My house is on top of the hill. I was at my house when I saw these parties. I went outside because the woman hollowed. I went close to the fence. These parties were close to the fence. They were not close to the river. They were close to the fence that is around China Garden. That China Garden is right in front of Hoolia's house. It is close to the river. I think it is about 300 or 400 yards from where I live to the river. I did not know who those parties were that I saw the bulk of. I knew

the woman because she had gone to Cander Larias' house. She had been there ever since she had been in town. Ever since she had come from Ozona, she had been staying at Cander Larias' house. It was about 10 or 11 o'clock at night, am not sure. This woman didn't go to Cander Larias' house on this particular night. Cander Larias wasn't there. I didn't hear any Mexicans talking down there that night. These three people I saw down there were about as far apart as from here to the door (about thirty feet). They were all three close together. I saw them doing nothing. It was about sixty yards from where they were to the river. I don't know where the body of Katie Ryan was taken out of the river. I remember distinctly these three parties were together that night when I heard that difficulty. Hoolia's house is a little to one side of Mollie's house. I never calculated the distance from Hoolia's house to mine. Hoolia's house is not between my house and where I saw these parties that night. I live up above Refugio's house on the hill. My house is closer to where I saw these people that night than Hoolia's house is." There is considerable testimony, which, if true, pretty definitely locates the appellant at or near the scene of the homicide on the night in question which we deem it unnecessary to set out. Some of these witnesses, in this connection, testify to hearing the cries or screams of a woman as if in distress. The appellant denied the killing and set up an alibi and introduced much proof to sustain it. This was made largely by his kinspeople. There is some additional evidence in the record of which we are not certain we get the entire force of appellant and his father driving in and around, or near the point of the river where the body of this woman lay on the Sunday following. We assume it was the object of the State to show a knowledge on the part of appellant of the death of the woman; that he was implicated therein and that he was keeping a watch to see whether her body would be discovered. These and many matters introduced both by the State and appellant, we deem it unnecessary to set out. What we have said will be sufficient to make the opinion readily comprehended. As a result of the trial appellant was convicted of murder in the first degree and his punishment assessed at confinement in the penitentiary for life and from this judgment he appeals to this court.

1. On the trial appellant filed a motion for change of venue, based on both of the statutory grounds in which he was joined by compurgators as required by law. This application and the testimony taken on a hearing thereof covers a very large portion of the record. We can not consider this bill for the reason that the testimony taken in support thereof was not filed and approved during the term time. Bink v. State, 50 Texas Crim. Rep., 445. Again, the statement of facts touching this matter is subject to the objection that it is for the most part a reproduction of the stenographer's notes by the ste-

nographer serving at the trial and is largely a reproduction thereof in the form of questions and answers. Essary v. State, 53 Texas Crim. Rep., 596, and Hargrave v. State, 53 Texas Crim. Rep., 147. The remaining questions are properly raised either in the motion for new trial or by bill of exceptions and we will take them up and dispose of them in their order.

2. The second and third grounds of the motion relate to the refusal of the court to give certain special charges requested by counsel for appellant. These charges are as follows: "Defendant, by counsel, requests the court to instruct the jury as follows: Gentlemen of the jury, you are instructed that the rule of law governing the jury in regard to weighing the testimony detailed to them in this cause is different from a civil case. In a civil case the jury can strike a balance and render a verdict without being satisfied beyond a reasonable doubt; but in this case, and in all criminal trials, the balance of evidence in favor of guilt must so predominate as to leave in the minds of the jury no reasonable doubt of the guilt of the defendant."

"You are further instructed, gentlemen of the jury, at the request of the defendant, that the burden of proof in this case never shifts from the State to the defendant, John King, but is upon the State throughout to first establish every constituent element of the offense, and the burden of proof is always on the State to overcome the presumption of innocence, and to establish the guilt of the accused beyond a reasonable doubt." In this connection it should be stated that in the court's general charge he had thus instructed the jury: "In all criminal cases the burden of proof is on the State. The defendant is presumed to be innocent until his guilt is established by legal evidence beyond a reasonable doubt; and in case you have a reasonable doubt as to the defendant's guilt you will acquit him, and say by your verdict 'not guilty.'" Almost from time immemorial our courts have decried the practice of undertaking to further elucidate the meaning of the statute and have uniformly held that a charge upon the question of reasonable doubt, which is in the exact language of the statute, is sufficient, and efforts to further elucidate its meaning are mischievous. Massey v. State, 1 Texas Crim. App., 563; Hampton v. State, 1 Texas Crim. App., 652; Chapman v. State, 3 Texas Crim. App., 67; Bland v. State, 4 Texas Crim. App., 15; Ham v. State, 4 Texas Crim. App., 645; Fury v. State, 8 Texas Crim. App., 471; Robertson v. State, 9 Texas Crim. App., 209; Holmes v. State, 9 Texas Crim. App., 313; Early v. State, 9 Texas Crim. App., 476; Robertson v. State, 10 Texas Crim. App., 602; Schultz v. State, 20 Texas Crim. App., 315; Bramlette v. State, 21 Texas Crim. App., 611; Johnson v. State, 27 Texas Crim. App., 163; Zwicker v. State, 27 Texas Crim. App., 539;

Abram v. State, 36 Texas Crim. Rep., 44. And that where the court has sufficiently instructed the jury as to the reasonable doubt, it is proper to refuse a special charge on the same subject. White v. State, 11 Texas, 769; Countee v. State, 33 S. W. Rep., 127. We think the court having charged the language of the statute clearly and explicitly, it was not only unnecessary, but would have been unwise to have gone further in that direction.

3. The next ground of the motion complains that the court erred in failing to define what was a particeps criminis, or an accomplice, and in failing to instruct the jury that the witness Huff was an accomplice. The court does not in his charge in terms instruct the jury that the witness Huff was an accomplice, but in the charge, the jury, in respect to his testimony are thus instructed: "You are further instructed that you can not convict the defendant upon the testimony alone of the witness John Huff unless you first believe that his testimony is true and connects the defendant with the offense charged and then you can not convict the defendant upon said testimony unless you further believe that there is other testimony in the case corroborative of the testimony of said Huff and connecting the defendant with the offense charged and the corroboration is not sufficient if it merely shows the commission of the offense charged." This was equivalent to instructing the jury that he was an accomplice. It placed the proper burden and limitation on his testimony and the jury could not have been in doubt under this charge as to the law touching his evidence. If the court had not in terms instructed them that they must find his testimony to be true and that it must be corroborated, or if it had been left in doubt as to the circumstances under which they would so regard his testimony, then indeed the court should have defined the term "accomplice" and advised and instructed the jury under what circumstances they would so require corroboration, but under the charge given, appellant is, we think, without just cause of complaint.

4. Again, counsel criticise the following portion of the court's charge: "Or if you believe from the evidence beyond a reasonable doubt that the said John King, in the county and State aforesaid, did unlawfully with express malice aforethought kill Katie Ryan by then and there striking the said Katie Ryan in some way and manner to the grand jury unknown," for that, as asserted, there was no proof of any kind or character by the witness Huff, or any-one else that the defendant, King, ever struck the deceased, Katie Ryan with anything of any kind or with any substance whatever, and for the reason further that that part of the court's charge complained of was without authority in law, because there was no evidence adduced in this cause that authorized any such charge. The entire paragraph eleven, which should be read together, is in this language: "Now, if you believe from the evidence, beyond a rea-

sonable doubt, that the defendant John King did, in the county of Tom Green, and State of Texas, on the 24th day of January, 1908, as charged in the indictment, with express malice aforethought, kill and murder Katie Ryan by choking the said Katie Ryan to death, or if you believe from the evidence beyond a reasonable doubt that the said John King in county and State aforesaid, did unlawfully with express malice aforethought kill Katie Ryan by then and there striking the said Katie Ryan in some way and manner to the grand jury unknown and with some substance to the grand jury unknown, or if you believe from the evidence beyond a reasonable doubt that the defendant did, in the county and State aforesaid, unlawfully with express malice aforethought kill Katie Ryan in some way to the grand jury unknown, then you will find him guilty of murder in the first degree and so state in your verdict, affixing the penalty therefor." The indictment in the case, among other things, averred that appellant with his malice aforethought did kill and murder Katie Ryan by then and there striking said Katie Ryan in some way and manner to the grand jury unknown and with some substance to the grand jury unknown. It further charged the murder to have been accomplished by appellant choking the said Katie Ryan to death, also by drowning her, and further, that he killed her in some way to the grand jury unknown. The evidence showed some slight bruises on different portions of deceased's person but none that would have caused her death except the wounds on her stomach. It was rendered probable, if not certain, too, by the evidence that she did not meet her death by drowning. The medical experts introduced say that her death could have been caused by a blow on her stomach, and that it was unlikely that such a wound could have been made by falling. The wounds on the stomach must have been made, and were made, by a blow. The State was unable to show just how the blow was given or with what substance inflicted, but the evidence clearly raised the issue that she was struck by someone and killed by a blow at the hands of some person, and this was not only an issue raised by the evidence, but to our minds rendered clear. There was, therefore, we think, no error in this portion of the court's charge.

5. Again, appellant complains that the court failed to charge the law of murder in the second degree. This contention is, as we believe, without merit. The evidence tended strongly to show that the murder was committed in the perpetration, or in the attempted perpetration of robbery. If this were true, then it became murder in the first degree by force of the statute. If the motive of the killing was not murder, considering the fact that appellant was an adult male, his victim a woman, the utter lack of any provocation, justification or excuse, the absence of any evidence that his mind was excited, the loneliness of the spot, his refusal to stay his hand,

when importuned by the witness Huff and all the circumstances of the case, make it clear to our minds, if he was in fact the slayer of this woman, that it was an inexcusable and horrible case of cold blooded and unprovoked murder.

6. Again, objection was made to the witness John Fisk, being permitted to testify as a witness in the case, and it was sought to be proven by him, as a matter of absolute disqualification, that he had been convicted of a felony and confined in the penitentiary. When appellant sought to make this proof the State objected for the reason that it was not the best evidence and that if relied upon the judgment of conviction was the best evidence and should be produced. That this is the law is no longer an open question in this State. Cooper v. State, 7 Texas Crim. App., 194; White v. State, 33 Texas Crim. Rep., 177; Williams v. State, 57 S. W. Rep., 837.

7. Finally, it is objected that the verdict of the jury is contrary to and unsupported by the evidence in the fact that there was no corroboration of the testimony of the witness Huff. We are not prepared to accede to this suggestion. The statement of the case given in the beginning of the opinion is an answer to this contention. As might be expected, the character of many of the witnesses relied upon by the State is not above suspicion. The witness Huff had been many times charged with felonies and his reputation for truth and veracity is shown to be bad. Many of the women introduced were of the most abandoned character, and there are other circumstances throwing some doubt on the State's case, that is to say, which would throw doubt on it as one reads the record in the seclusion of his chambers. The jury, however, saw these witnesses and heard them testify; the learned trial court, who for many years has presided over the tribunal in which the trial was had has permitted the verdict to stand. He, too, had opportunities to observe the witnesses which we have not. On appeal we are utterly without excuse to place any opinion that we might have against that of the jury, and the court that rendered the sentence against him.

Finding no error in the record, it is ordered that the judgment of conviction be and the same is hereby in all things affirmed.

*Affirmed.*